16-1430, Truck Trailer Manufacturers Association and Petitioner v. Environmental Protection Agency, et al. Ms. Theodore for the petitioner, Mr. Byron for the respondents, Ms. Henderson for the respondent intervenors. Theodore. Good morning, Elizabeth Theodore on behalf of Petitioner Truck Trailer Manufacturers Association. I'd like to reserve five minutes for rebuttal and I'll start with the EPA regulations and then turn to NHTSA. So the Clean Air Act speaks directly to the question whether the EPA can regulate trailers and make it clear that it cannot. Section 7521 authorizes the EPA to regulate motor vehicles and section 7550 defines a motor vehicle as a self-propelled vehicle designed for transporting persons or property on a street or highway. And since trailers are not self-propelled, that is game over for the EPA. And if the court had a chance to look at the 28-J letter that we filed yesterday, the IRS just reached the exact opposite conclusion from the EPA and said that that same language unambiguously excludes trailers. So one of these two rules violates the EPA and is clearly the EPA's rule. The self-propelled limitation also precludes EPA's theory that it can regulate trailers as part of a quote-unquote tractor trailer vehicle. Trailers are the only thing designed to transport people or property on the road or highway that is pulled by something else. And the term self-propelled had to have been designed to exclude trailers. EPA doesn't dispute this and has no alternative explanation for this language. And that text would be completely meaningless and ineffective if the EPA could just regulate trailers on the ground that they're pulled by tractors and tractors are self-propelled. Congress obviously knew the trailers were hooked up to self-propelled vehicles when it chose to exclude them. The tractor trailer theory fails for multiple other reasons. There's no such thing as a unitary tractor trailer vehicle. Tractor and trailers are never permanently married to each other. They're separately regulated under federal law. They have separate vehicle identification numbers under federal law. Many shippers own six trailers per tractor. Why do they have to be permanently married, as you said? The question is, what is their status on roads and highways? And on roads and highways, when they're traveling on roads and highways, they are a single unit. That's how they transport property. So there's no one tractor and one trailer that's a single unit. And I mean, the proof is in the pudding. So the EPA claim... But why does, I'm asking why you would sort of, there's not one as in permanence, but maybe there's one somewhere in the country that I don't know of. But if there, if I guess there were, that would, would that count? If there were actually someone who owned both a tractor and a trailer and at least, you know, rented his service or her services out for moving stuff with that person, then, with that, with that vehicle, then the trailer and tractor combined count? That still would not be a motor vehicle under, under... It doesn't matter whether it's permanent or not in your view. But then why, why isn't it when it's on the road together? That's what the statute is looking at, is on the road and on the highway for, for the EPA, on the road and on the highway. And that's how they function together. If I'm driving by a semi truck, I don't think I'm going just by the tractor. I'm going by the combination of the two. And if I feel like I'm hit by a semi truck, I've got to be the two of them together. That's going to be causing the terrible harm to me. And my understanding is that when you get to weigh stations, they weigh it together as a single unitary. I mean, that's what the gross vehicle weight at a weigh station measures is the single unitary weight of the thing, of the tractor and its trailer and contents together. Well, so in the context of the, of the Clean Air Act, it's very clear that the motor vehicle can't be the joint tractor and trailer. And, and just look at the rule itself. Why is it very clear? And I'll explain. So there's a, there's not a single aspect of this rule that actually regulates a joint tractor and trailer. And that's because it's impossible under the statute. So just one example is the certificate of conformity requirement in section 7522. That requires a certificate of conformity for a motor vehicle before it's sold, but you can't get a certificate of conformity for a joint tractor trailer because they're always sold separately and that's uncontested. So that, that provision would be impossible to apply if the quote unquote regular, regulable motor vehicle was the tractor trailer. And the regulation in fact requires a separate certificate of conformity for the tractor and for the trailer. It's not treating them as a single, as a single motor vehicle. And similarly, so the EPA can only regulate vehicle manufacturers under the statute. That's also uncontested. Trailer manufacturers don't manufacture tractor trailers. They only manufacture the trailer. And just in this, you know, so the government relies on this engaged in language, but you know, no one would say that Goodyear tire company is engaged in manufacturing vehicles just because it makes tires and tires goes on vehicles. And similarly, the warranty provisions in section 7541 are incoherent if the, if the vehicle is the tractor trailer. So that provision requires the manufacturer to warrant the motor vehicle to the so-called ultimate purchaser before it's sold. And first of all, there is no ultimate purchaser of a tractor trailer because again, they're always sold separately. And second of all, EPA's theory would mean that the trailer manufacturer has to warrant that the entire tractor trailer complies, which is impossible because the trailer manufacturer has nothing to do with the tractor. And EPA's theory also, so it says that it can regulate trailers as like a quote unquote integral component of a tractor trailer that makes the Clean Air's authorization of motor vehicle engines and engine manufacturers utterly superfluous since engines are obviously an integral component of a vehicle. And so, so for all of those reasons, but again, I would return just to the use of the word self-propelled in the statute, which is obviously intended to exclude trailers. EPA has no authority to regulate that. Why isn't the tractor for all intents and purposes, the engine that gets attached to the trailer and then makes the trailer move, right? That's really what the function of the tractor is, is to haul the trailer around, to make the trailer mobile and able to be moved to different places. Perhaps, but that doesn't make the trailer self-propelled. It means the trailer is propelled by something else. It does talk about regulating. It does talk about regulating both engines and vehicles. Both can be regulated. Yes. So that suggests to me that there's some regulation of vehicles that's distinct from regulation of an engine. So I think the goal of the separate authorization to regulate engines or vehicles just authorizes EPA to regulate engine manufacturers separately so that they don't just have to apply regulations to engines in the context of regulating the motor vehicle after the engine has been incorporated. I think that's the real goal there. But why isn't this the incorporation, when it becomes a tractor-trailer, why isn't that the incorporation of the engine into the vehicle? So I think if the EPA wanted to regulate a motor carrier that assembles a tractor to a trailer, maybe they could do that, but they certainly can't regulate the trailer manufacturer. So the statute says manufacturing or assembling of the new motor vehicle. So when you say maybe, it seems like it's not a maybe, it definitely could regulate an assembler. Isn't that right? It definitely can regulate an assembler. I think there's a question whether putting the trailer to the tractor creates a motor vehicle for all the reasons I explained, that like the certificate of conformity and warranty requirements. That's with respect to this regulation, just to be hypothetical for a moment, and picking up on Judge Millett's questions. So the term motor vehicle means any self-propelled vehicle designed for transporting persons or property on a street or highway. When it's assembled, it is self-propelled and it's designed for transportation on a highway. So that would seem to be able to regulate assemblers and require an assembler to only assemble a vehicle that meets the emission standards as an assembled vehicle. Potentially. Potentially. And, you know, as we said in the regulatory comments, if EPA's theory that a tractor trailer is a motor vehicle under the statute has any legs, then the only thing they could do would regulate the assemblers. But there's no dispute that the trailer manufacturers, which is who is being regulated in this regulation, are not manufacturers and are not assemblers. And let me turn to- Could I ask, sorry, I don't want to keep you from getting to what you want to get to, but could EPA pass a regulation that says tractors are banned, these types of tractors, are banned from traveling on roads and highways if they're pulling loads that cause the tractor's emissions to increase by XX amount. And that XX is some fancy computation of sort of on average how much trailers cause tractor emissions to increase. Possibly. And the- It could do that. It could do that, right? I don't see why it couldn't. That's a direct regulation of tractors and their emissions. I think probably yes. And the current- But isn't that getting to the- I'm sorry, go ahead, finish. The current tractor regulations do sort of assume a hypothetical trailer load as well. But it's not the same thing as regulating trailer manufacturers. But wouldn't that be, I guess it seems like it's, you're saying that they can do indirectly, they can't do directly, but they can do indirectly. Because if they were to pass something that said no tractors can go on the road if their emissions are up at the level they would be if a trailer were attached, everyone knows it's going to happen. Every trailer manufacturer is going to have to put on some of the things here, the aerodynamic curtains and the backing and the otherwise no one's going to be able to pull their trailers. Well, so the members of the TTMA are actually totally fine with attaching equipment that their customers demand. But it does make a difference who a regulation regulates, right? So motor vehicle manufacturers, like their billion dollar organizations, trailer manufacturers, the overwhelming majority are small businesses. And this regulation imposes huge compliance costs. And Congress didn't intend for trailer manufacturers to bear those costs. And it's clear that it didn't because it used the word self-propelled. Let me turn to the NHTSA rules. So the EPA's clear lack of statutory authority means that the court should vacate the entire portion of the rule because NHTSA's rules are non-severable from EPA's. And under the broadcaster's case, a rule is non-severable if the agency didn't intend severability or if the remainder of the regulation couldn't function sensibly without the stricken provision. Similarly, the Supreme Court said in Kmart that it's non-severable if striking the invalid parts would impair the function of the regulation as a whole. Have those rules ever been applied when you're dealing not with a single set of regulations, but separate regulations issued by two different agencies? Is severability even the analysis to determine whether those regulatory schemes function? Yes, Your Honor, for a couple of reasons. First of all, I mean, all of this court's discussion and the Supreme Court's discussion of the rule is it takes the text, which is the rule, and looks at each part. But more specifically in the Delta case, which is this court's case, the court did essentially apply a severability analysis to a joint EPA NHTSA rule. And it said that they were severable because in that case, NHTSA's rules weren't dependent on EPA's. And that's just the severability analysis. You wanted them to be not severable, right? I'm sorry? I thought you wanted them to be not severable. And in Delta, they were severable. In Delta, they were severable. And Delta is just example of the court applying the severability analysis in the same way to a joint agency rule. Here, of course, the NHTSA rules are very clearly dependent on the EPA's rules. Can you elaborate on that a little bit? Because I took your reply brief to focus in particular on three aspects of the regulation that would not work if you took the EPA out of it. And hopefully I can remember all three right here. One was the compliance certificate, certificate of conformity. Only EPA can issue that. Another was the setting of the standards under the regulations. EPA sets the standards. And then the third was the testing. So to see whether or not a particular trailer would satisfy the standards that EPA sets, the regulation imagines that the EPA will do the testing. So the government says that that will all basically work even if you take EPA out of the equation. Can you go through each of those three and explain why you think that's wrong? Sure. And let me start with the certificate of conformity. So there's no dispute that the EPA is not issuing certificates of conformity because this court stayed its rules and held that it doesn't have authority to regulate trailers. And the NHTSA standards, in particular section 535.10, state that manufacturers may not introduce vehicles into commerce without a certificate of conformity from EPA and that manufacturers not completing these steps do not comply with the NHTSA fuel consumption standards. And you obviously can't The government, I'm sorry to interrupt, but the government says we just scratched that part out. So now the trailer manufacturers don't ever have to get a certificate of conformity. Problem solved. Right. So, and there's sort of two responses to that. The first is that's not the way separability analysis works, right? The question isn't could the rules be rewritten in a way that would allow them to function? The question is whether the rules as written can function without the stricken provisions. And that's very clear. And second, you can't strike the core regulatory requirement. And it's the only way that trailer manufacturers can even be assured that their vehicles are in fact compliant with the substantive standards. So, I mean, you can ask the government, but I just don't know how the regulation could possibly function. On the other two, the setting of the standards and the testing, couldn't EPA just continue to set standards that on their own do not have force of law, but NHTSA could take the standards that EPA sets and apply them to trailers with the force of law. And same with the testing. EPA could still do the testing. You wouldn't get fined by EPA if you violate EPA's test, but you would get fined by NHTSA. So I don't think so, Yara. And I'll provide the same response, which is that the regulations as written just don't make any sense. They can't function if you strike the EPA regulations, because they would be cross-references to nothing, to invalid provisions. But also, EPA can't regulate without congressional authority. I mean, NHTSA can't outsource its authority to another agency without congressional authority to do that. And look, I mean, the agencies don't even really believe what they're saying, because the fact of the matter is, EPA is not conducting the testing right now. It's not issuing certificates of conformity, and that's because this court said it didn't have authority to do so. One last question, Ms. Theodore. Do you have a sense of what this costs, this regulation of trailers? For the trailer manufacturers? For the economy, yeah, for the trailer manufacturers. You know, I don't know for the economy, but for the trailer manufacturers, you know, it depends on the manufacturer, but for some of them, you know, the compliance will cost millions of dollars. And again, these are small businesses. This is a big deal for them. But I mean, nationwide, do you have a sense? Are we talking about a billion-dollar impact on the industry, more than a billion? It's okay if you don't know. I'll ask the government the same question. Yeah, I don't know the answer to that. Okay, so I think, you know, the NHTSA rules are way more intertwined than other rules that this court has held non-separable before, and I don't think it's really, I don't think this is really subject to reasonable dispute. There's no way that NHTSA would have adopted this exact same regulation, cross-referencing EPA's rules 400 times. Can I ask, is that the question, is the question about function a question of NHTSA's intent, or just a question of whether it's arbitrary and capricious if we sever apart and leave the rest? I mean, the intent is clear. They've said what their intent is. We want it to stand alone. It could still be arbitrary and capricious, and that I think is what the function test goes to. I don't see, or in a circumstance where the agency hasn't told us what their intent is, then of course you would look at it. Is that, do you think that's the right kind of analysis? I think the function test is independent of the intent test, and that's what the court said in Broadcasters. Independent because what are we is it the arbitrary and capricious standard? I don't, I don't think so because I mean it applies to the same analysis applies to statutes as well. But that there in the case that you cite there, it's used to determine intent where intent isn't clear. I'm asking you, I mean, where would we get the authority to simply say that this doesn't function unless it's because it's arbitrary and capricious without the other part of it? I mean, I suppose, I suppose you could, you could say that. I don't, I don't know, but it's clear the court does have the authority because I mean the Supreme Court has the Kmart decision which says that the question is whether striking one part of the regulation would invalidate the, would impair the function of the regulation as a whole. So it may be that. Remind me, in that case, was the, did Congress express its intent? In the Kmart case? Yeah. It was a regulatory case. Okay, then in that case, did the express? I'm, I'm, I'm not sure, but I can tell you that in the Broadcasters case from this court, the agency did have a separability clause and nonetheless held that the regulations were non-separable because they couldn't function independently. Which sounds like because they were arbitrary and capricious it wouldn't. Perhaps, doesn't function. And I think that makes a lot of sense as the explanation for the analysis. Thank you. So let me turn quickly to the NHTSA question. Even if the rules were, were severable NHTSA lacks authority to regulate the quote-unquote fuel economy of trailers. And that's because trailers don't have fuel economy under, under the definition in the NHTSA, in the ESA. NHTSA agrees that trailers don't consume fuel. And so the standards that are issued here are not fuel economy standards within, within that definition. And second, trailers aren't vehicles within the meaning of ESA either. Vehicle in this context clearly means fuel consuming vehicles. That's what all the other vehicles in the list are. And section 108 of the ESA refers interchangeably to this category of vehicles as trucks. Which under the statute and under NHTSA's long-standing regulatory definition does not include trailers. And I'd like to reserve the remainder of my time. Can I ask the NHTSA's Organic Act says a motor vehicle means a vehicle driven or drawn by mechanical power. So if you were looking anywhere for the closest definition, you would look at this agency's own statute. And this is clearly a vehicle driven by or drawn by mechanical power. In fact, it is a vehicle drawn by mechanical power. Well, Congress did not, of course, incorporate those provisions into the ESA. Did not incorporate that definition. That's true. But they also didn't incorporate the EPA's definition of vehicle. That's true. And we're not relying on the EPA's definition to analyze the meaning of vehicle in the ESA. But there are a number of other textual clues, including the statute's focus on fuel, the definition of fuel economy, the fact that the statute refers interchangeably to trucks when it's describing this category of vehicle. And trucks, of course, are vehicles that have motive power. The fact that the one provision of the ESA, which refers to trailers, also distinguishes between trailers and trucks. And the fact, so, I mean, all of those are very strong textual clues that what Congress meant here did not include trailers. All right. Further questions from the bench? If not, we'll go to Mr. Byron. Thank you, Judge Garland. May it please the court. Thomas Byron from the Department of Justice here on behalf of the federal government agencies. Both NHTSA and EPA independently exercised their authority under their respective statutes and trailers as the relevant vehicles subject to fuel efficiency and greenhouse gas emissions regulations. The statutes themselves do not address Congress, that is to say, did not specifically preclude the agencies from regulating tractor trailers as motor vehicles in this way. So, this question comes down to step two of Chevron and the reasonableness of each agency's explanation for its statutory interpretation. And here the agency's... Mr. Byron, NHTSA just recently, I'm going to try to find this, issued a regulation in 2020 that said it talks about a vehicle and a trailer attached to the vehicle. And that it's cited in the manufacturer's brief. It's from April 30th, 2020. NHTSA itself talks about a trailer as recently as this year as not being a vehicle, but rather being something that is attached to a vehicle. What do I do with that? Judge Walker, I think you're referring to what the agency's called a safe rule, which is under NHTSA's CAFE authority, that is the Corporate Average Fuel Economy Authority, governing automobiles and light trucks. It does not, of course, cover or even in any way turn on any other regulation that does affect tractor trailers. So, there's no doubt... So, it's not talking about tractors and trailers. It's talking about a regular car and something that might hitch to the back of a regular car. That's exactly the focus of the safe rule and the CAFE scheme as a whole, which does not cover tractor trailers. Before I forget, do you have a sense of the question I asked Ms. Theodore about what this I don't recall the specifics, but I can point you to the part of the record that does address that, and that is the Impact Analysis and the Regulatory Impact Analysis. So, the RIA, the Regulatory Impact Analysis, begins at JA-429. The impact assessment by the agencies in the final rule, and this is not specifically the economic impact on the industry, but that section begins at JA-135. And within that section, my memory is that the agencies did address the economic impact on trailer manufacturers specifically. I apologize, I don't have the specific pages. I'll stop interrupting you, at least for now. Not at all, Your Honor. So, I do want to link the question you asked about the CAFE regulations to EPA's analysis of its statutory authority here, which I think confirms the point that Judge Millett was getting at in one of her questions, which is how the agencies here undertook a real world analysis, a practical analysis of how tractor trailers as motor vehicles are perceived as a single vehicle proceeding down the highway by other vehicle operators. That's important here, and it does reflect as well the room that Congress left within both statutes. But when EPA was interpreting its authority under the Clean Air Act to regulate tractor trailers as motor vehicles, one thing they made very clear is that the tractor without the trailer or the trailer without the tractor is not itself a single vehicle. Only because the two are designed to work together are they a single motor vehicle. That's quite different, the agency explained, from an automobile or a light truck pulling a separate trailer, which is what, you know, I think you were referring to in the SAFE rule, if I recall correctly. Unfortunately, I don't have the SAFE rule in front of me. The agency explained that that significant difference is what underlies its statutory interpretation here. The tractor trailer is the vehicle subject to regulation. I don't, I guess I'm a little confused about that because surely you regulate the tractor, if you had someone who had one of these tractors and just liked driving this great big thing down the road, never attached trailers to it. That tractor would be completely regulated by whether it attaches or not to trailers. That tractor is itself regulated by these provisions because it's transporting a person. Your Honor, the question isn't whether any individual driver intends to use it. The question is whether the vehicle under 7521-2 is designed for transporting persons or property. And that tractor is designed for transporting property. It's also designed for transporting the driver. I don't think that's an accurate understanding and that's certainly not the interpretation that EPA has given to that provision and that interpretation is a reasonable one, Your Honor. The tractor is designed to function as part of the tractor trailer vehicle. I guess I'm having a little trouble understanding that because one, I've seen these tractors going down the road by themselves. Presumably they've dropped off a load, don't have another one to pick back or they're driving to the next place to pick up a load. And it's definitely designed to transport the person to and from, shall we say, work where they pick up trailers. It has, a lot of them have little cabs in the back with little bedrooms and everything. They're definitely designed to carry that person to and from hauling assignments and then through the haul, it carries that person through the hauling assignment. I don't, and you have, you know, are you saying you can't regulation, regulate the emissions of the tractor itself? Judge Millett, the agency has not said that and I'm not taking that position here. What we are seeing, what the agency has said and what we are defending here is the proposition that these tractor trailers operate as single vehicles on the highway. They're designed to operate that way as single vehicles. And each part of the tractor trailer is subject to the requirement that EPA imposes that any manufacturer of a motor vehicle, and that includes both the tractor manufacturer and the trailer manufacturer here, can be required to any manufacturer language is what really does a lot of the work here. And I don't think that petitioner's argument fairly addresses the statutory scheme as a whole by focusing solely on the motor vehicle because here the motor vehicle is the tractor trailer as a single vehicle. Both manufacturers are within the statutory requirement of any manufacturer that can be It's not a vehicle even under your view. It's not a covered vehicle until the two are put together. No, I don't think that's right, Judge Millett. It certainly is a motor vehicle when the two are put together. And by the way, I think you asked about, you know, whether there are some operators and again, doesn't matter whether an individual operator does anything. It's how they're designed, but certainly true as well. And the record reflects that some operators do keep their tractor and their trailer combined full time essentially. But that's not essential here. And the key point is that the agency understood its authority to cover the tractor trailer when both parts are designed to work together and that both manufacturers can be subject to those regulations. Is there any manufacturer that manufactures both the tractor and the trailer? I'm not aware of any, Your Honor. But again, the whole idea of any manufacturer is an expansive concept. The word any is expansive as this Supreme Court have recognized. But fundamentally, it doesn't matter whether the Clean Air Act or APCA as modified by ISA authorizes the agency as long as it authorizes an agency to regulate tractor trailers, as long as the other statute does. And here, no matter what the court thinks about one authority, the other authority under APCA is ample to support the regulations of NHTSA to impose fuel efficiency requirements on tractors. Mr. Byron, on that point, can you walk through the three things that I was asking Ms. Theodore about? Let's say that we find the EPA didn't have the authority to do this. Let's say we find that NHTSA did. NHTSA's regulation mentions EPA, I think, 400 times. And in particular, there are at least three things that the manufacturers argue just don't work in this regulatory scheme when you take EPA out of it. One is the compliance certificate. One is that only EPA issues. One is the standards that only EPA sets. And one is the testing that EPA does. Can you talk about what would happen to each of those things if we strike down the EPA's authority, but we find that NHTSA did have authority? Certainly, Judge Walker. And if I may step back just for a moment to put that in context, the key point here is that all three of those are elements of the compliance mechanism that each agency adopted with respect to its own standards. The fact that NHTSA required, in order to demonstrate compliance with the fuel efficiency regulation, required a manufacturer to obtain a certificate of conformity from EPA, that's merely a mechanism of demonstrating compliance with the fuel efficiency regulation. It's not itself a predicate that requires EPA to have independent regulatory authority under the Clean Air Act to set its own standards. Are you saying NHTSA would allow a trailer to be manufactured, even absent an EPA certificate of conformity? Well, I think, Judge Walker, that two alternative approaches are equally available to the court in the scenario you've outlined. I do want to hear them, but can you answer that one first? Would NHTSA allow a trailer to be manufactured that doesn't get an EPA certificate of conformity? So, yes, Your Honor, if this court were to hold that the EPA regulations providing a mechanism for trailer manufacturers to obtain a certificate of authority were themselves invalid, then yes, of course, NHTSA would permit other mechanisms to comply, demonstrate compliance with the fuel efficiency regulations. Are those mechanisms in the regulations already, or would NHTSA make them up? Well, Your Honor, I think there's not an alternative specified to obtaining a certificate of conformity, but there are other ways that NHTSA's regulation specifies that trailer manufacturers can demonstrate their compliance with the fuel efficiency regulations by submitting the compliance information either through EPA's own database or to the CAFE database. I thought you just said NHTSA won't allow a trailer to be manufactured if it doesn't get an EPA certificate of conformity. Well, Your Honor, if this court strikes down, and this is the important point that I need to return to in just a moment, but if this court were to strike down the EPA regulation that permits trailer manufacturers to obtain a certificate of conformity, of course, as a consequence of that, NHTSA could not require trailer manufacturers to do something that this court said they cannot. Okay, so that first of the three things is no longer a requirement. What about the other two? EPA sets the standards, EPA tests. What happens to them? Judge Walker, can I just return to the other aspect of this that I didn't get to, which is that this court could strike down EPA's Clean Air Act greenhouse gas emission standards without striking down the provisions that allow trailer manufacturers, like other heavy-duty vehicle manufacturers, to obtain a certificate of conformity. In other words, the certificate of conformity is not available because NHTSA has specified that the certificate of conformity is required. This court could conclude that the certificate of conformity mechanism could remain in place to permit compliance with NHTSA's regulation. My point was that both paths are available. Could you just say a little more on that? I'm sorry to interrupt as long as you're on that topic. What would be, if we were to say that the trailer is not a vehicle under the Clean Air Act, what would be EPA's authority to issue certificates of compliance? Judge Garland, of course, a lot would depend on what this court concluded about the scope of the Clean Air Act and the EPA's authority. Unless this court were to conclude that its EPA from assisting NHTSA in compliance with the fuel efficiency regulations. I'm asking what permits it to assist in that way. Assume all we hold is that it's not self-propelled, that means that the regulation of emissions of trailers isn't permitted. What authority remains for the certificate of compliance? Well, Your Honor, remember the certificate of compliance mechanism in the EPA regulations is not directed solely to trailer manufacturers, but to all heavy duty and in fact other vehicle manufacturers as well. And here NHTSA merely adopted the existing regulatory scheme. Now it happens that the regulatory scheme at the time NHTSA adopted it, and again this was to reduce the burden on manufacturers. So the petitioner here is turning a regulatory virtue into a vice, but the point of adopting that existing framework was to minimize the burden on manufacturers. In doing so, even if EPA didn't have authority to adopt that framework with respect to trailers on its own, the fact that it had adopted the framework for other manufacturers, for example, wouldn't have precluded NHTSA from requiring trailer manufacturers to use that existing streamlined mechanism instead of adopting an entirely new burdensome requirement. Now the fact is here, of course, there is a specific mechanism in the certificate of conformity requirement specific to trailers, and again that's a virtue not a vice. It actually minimizes the burden on manufacturers. They don't have to do all of the same things that other vehicle manufacturers do. They just have to use the formula that's based on the model, the GEM model. But all of this is to say, just to go back to Judge Walker's question, that this court might or it might not conclude that the compliance mechanism in the EPA regulations is precluded by the Clean Air Act. If it does, then that wipes out the need to obtain a certificate of conformity to comply with NHTSA's fuel efficiency regulations. The other requirements of compliance would remain. If it doesn't, then that leaves to the agencies the available opportunities to specify the least burdensome, most consistent mechanisms for compliance with NHTSA's regulation. Judge Walker, if I may turn to you. Very briefly, Mr. Byron, standards and testing, can you, as briefly as can, explain how EPA standards and EPA testing can still continue if the EPA standards and EPA testing with regard to trailers can still continue even if EPA does not have the authority to regulate trailers? Sure, Judge Walker. Standards are easy, and I'll just step back and remind the court that both Delta Construction and Massachusetts Against EPA recognize that there is a scientific relationship between CO2 emissions and fuel consumption, so that the fact that the formula measuring fuel efficiency and CO2 emissions is the same is just a reflection of that scientific relationship. It's not a reliance on any EPA regulatory authority, and looking back as well in the context of the CAFE regulations that we were discussing earlier, EPA measures CAFE fuel economy compliance by measuring CO2 emissions from vehicles. That's how, in order to determine compliance with NHTSA's CAFE regulations. So historically, that's how CAFE fuel economy has always been measured for compliance purposes. So then with respect to testing, Your Honor, the question of testing, and this is just again the auditing function that applies to, I believe, sorry, at least all heavy-duty vehicles in this context, the fact that NHTSA has adopted a mechanism that reduces the burden by relying principally or initially on EPA's testing mechanisms that are in place, again, with respect to the broader industry is a virtue, not a vice, and the question whether there might be some other way for NHTSA in the event it determines it needs to audit or test a particular vehicle or particular technology is not something that requires this court to strike down the standards themselves. There's no substantial doubt that NHTSA would have adopted the standards, irrespective of whether it could have relied on Judge Walker. I would just urge Judge Garland, if I may, turn to a question that you raised in Petitioner's argument briefly, the question whether the function test in the severability inquiry is meaningfully different from the intent test. I think that a fair reading of the Maryland, D.C., Delaware broadcasters case makes clear that it's not genuinely independent, and it's true, of course, that the court in that case italicized the word and when it linked the two inquiries, but then when it applied the function test, it did so in the context of assessing the agency's underlying intent and emphasized, if I may, that option A would not have been sufficient to achieve the commission's goals and, in fact, would undercut the whole structure of the rule. Those references to goals and undercutting the structure seems to me turn as much on intent as on anything separate from intent. In other words, it seems that the court there merely disbelieved, if I may, the court's severability expression of intent when it itself analyzed the readily that each agency has independent authority, exercised that independent authority, and validly expressed its intent that each set of standards can stand on its own independently. I just ask a question. Do you then concede that when you're talking about two separate regulatory systems, the analysis is severability as opposed to simply determining whether if one were to fall and one were to stand, whether the standing one's provisions that refer to the other are arbitrary and capricious or something? I'm just not aware of severability being used in this context. Judge Millett, the petitioners here framed this in terms of severability, so our brief did so as in response. No party has briefed as far as I can tell whether the arbitrary and capricious standard would apply, and there's no argument that the NHTSA standards would be arbitrary and capricious on their own. I'm talking about the regulatory provisions across reference EPA. I understand. You've made some arguments as to why it would still make sense. I'm just trying to figure out whether you agree we should be using the severability lens here or simply looking at regulations cross-references and figuring out what to do with that. I think that there are good reasons to look at this through the lens of severability, Judge Millett. Those reasons include the fact that the preamble was jointly prepared by both agencies together, that they intended to create a harmonized set of regulatory requirements for a single industry here in order to reduce the burden. Did the EPA regulations come into effect three years earlier than the NHTSA ones? Yes, and that's because each statute provides different lead time requirements, of course, and the agencies have independent authority that they exercise. Judge Millett, I don't want to preclude the possibility, as you suggest, that the court need not adopt a severability analysis. You need to tell me what the government's position, right? If the government agrees that severability and is not arguing otherwise, then I don't know why we would spontaneously take on the issue ourselves. Well, not only, I think, Your Honor, is it correct that you need not spontaneously take on the issues yourselves, but also because Petitioner has not argued that the remaining NHTSA fuel efficiency regulations would be arbitrary and capricious merely by referring to EPA's regulations. I think they have waived that argument, so it need not be addressed by the court in this context. All right, thanks. For those reasons, Your Honor, we'd urge the court to deny the petition for review. Thank you. Thank you, Mr. Byron. Ms. Henderson? For the respondent. Thank you, Your Honor, and may it please the court, Alice Henderson for the respondent interveners. I'd like to briefly address two of the issues related to EPA's authority that have been discussed and then turn to the joint compliance regulations. I noted, Judge Millett, that you made a note of the authority that EPA would have to set a tractor standard that would be at a level that would require trailer improvements, and I wanted to note that the reason EPA structured the regulations the way it did here with obligations for both the tractor manufacturers and the trailer manufacturers is because of the way the industry has segmented itself. So the tractor manufacturer never comes into possession of a trailer, and that's why it's necessary to achieve emissions reductions from the whole vehicle to create obligations for both manufacturers. And TTMA doesn't deny that if a single manufacturer was in charge of building both the trailer and the tractor, that that whole vehicle could then be subject to an EPA standard. But the Clean Air Act isn't written to allow manufacturers to decide which aspects of a vehicle could be subject to a motor regulation by splitting up the production among different entities. And I note that counsel for TTMA made the point that it wouldn't make sense under the Clean Air Act to require a trailer manufacturer to warrant that its vehicle would not cause the motor vehicle to be in non-compliance with an emission standard. This just proves that it is a very large motor vehicle, the largest motor vehicle on our highways. And the fact that the Act isn't written in a way that would allow treatment of the trailer as a part just goes to show that it must be regulated the way that EPA has reasonably done so here, because otherwise you'd have to assume that Congress intended to create a really large gap in the other heavy-duty vehicles that have cargo sections like UPS delivery trucks, but not the cargo section of a tractor trailer, which serves the same purpose, but at a much larger scale and with greater resulting emissions. Is that argument, Ms. Anderson, a little bit different than the government's argument? I take the government to say, and I'm on page 12 of the red brief, Congress did not address the question whether the agency could regulate trailers. You seem to be saying that Congress wanted the agency to regulate trailers. Our position is that EPA's determination that the tractor trailer is a motor vehicle is a permissible interpretation of ambiguity in the statute. Well, see, now there you sound more like the government, that Congress really didn't make a decision whether EPA, and perhaps even NHTSA, actually it's NHTSA here too, should regulate trailers. Is that your position? No, Your Honor. These are two separate rules that are operating under two distinct statutory authorities. Our position is that NHTSA has effectuated the unambiguous intent of ESA and should be upheld at step one of Chevron, and that EPA has permissibly interpreted ambiguity with regard to the meaning of motor vehicle in the Clean Air Act. I'd like to address the issue related to the compliance regulations. ESA creates authority for EPA to promulgate the regulations that it has here, and the authority that EPA has under ESA is completely separate from the authority that EPA has under the Clean Air Act to set an emission standard. And so all of the regulations that are necessary for a manufacturer to comply with a fuel economy standard can be upheld under EPA's ESA authority. So if the court finds that... I'm sorry. It's hard to interrupt with lag. Could you cite the statutory provision in that you're referring to? Sure. So 32904 of ESA directs the EPA to calculate average fuel economy for a manufacturer subject to a standard under 32902B of the Act, and the state intervenors lay out the 32907 and 32910 of EPCA – I'm sorry, the Energy Policy and Conservation Act as amended by ESA also clearly contemplates a central role for EPA in facilitating implementation of fuel economy standards. And this is true of all of the vehicles that are covered under this rule, not just... Just pause for a moment. I may not have all the necessary statutory provisions in front of me, but the 32904 says EPA shall calculate the average fuel economy of a manufacturer subject to... Which of the provisions that follow... What's the definition of manufacturer for purposes of that section? So that 32904, which references manufacturers subject to a standard under 32902B, unambiguously includes manufacturers subject to a heavy-duty standard under 32902B1C, and that's what the state intervenors argued in their brief. Okay. Thank you. Sure. And so just going back to the functionality of the compliance regulations, if this court were to find that EPA lacks Clean Air Act authority, the remedy for that finding would not be to invalidate all of the regulations that could be upheld under EPA's ESA authority, and everything that a manufacturer would need to comply with a fuel economy standard is written in those regulations that EPA has clear authority to promulgate under ESA. Ms. Henderson, could your argument with regard to the role of EPA under ESA cut against you? And here's why I'm wondering that. If ESA imagines a regulatory role for EPA, and if the EPA doesn't have authority under the Clean Air Act to regulate trailers, then it seems like maybe we should interpret ESA to not cover trailers. I wouldn't say that's true, Your Honor. These are two separate and distinct statutes that serve completely different purposes, and this court in Delta Construction recognized that when it held that even if an EPA standard were vacated, the NHTSA standard would remain because it was a separate action with independent legal effect. And maybe just to clarify, EPA doesn't have authority to set an emission standard under ESA, but ESA contemplates a really central role for EPA in aiding in the implementation of a fuel economy standard, and that's because of the expertise that EPA has in testing. And that role for EPA has been understood under the Energy Policy and Conservation Act as well as ESA, which amended it. And 32904C also says that to the extent practicable fuel economy tests should be carried out with emissions tests under the Clean Air Act. I'm trying to figure out how that NHTSA regulations to rely on EPA to do some of the measuring and certifying here. Does it help or hurt because they're no longer going to be doing, if they were no longer hypothetically doing emissions tests for trailers, would this support or not support that cross-reference to having them do the measurements and calculations for NHTSA? I think it supports the position that EPA has clear authority to promulgate the regulations that it has to facilitate implementation of fuel economy standards. As you noted, it's to the extent possible to align those with emission standards. And if there aren't comparable trailer greenhouse gas emission standards in place, that wouldn't affect EPA's authority or ability to execute its regulations that it has promulgated for this rule. And I guess I'll just note on that point as well that the compliance process regulations that we're talking about here are written as instructions to manufacturers about how to generate the input values for a formula. And then that formula spits out a number and manufacturers are able to compare that number to at the CO2 level and compare that number to the actual substantive numerical EPA emission standards. So in no way are these regulations dependent on the existence of an emission standard. They're drafted to facilitate both the compliance with emission standards and fuel economy standards, but they aren't intertwined with the substantive emission standard. Ms. Henderson, I don't pretend to understand to be able to do the math that is in the formula, but I imagine that there's some part of the formula that is a variable based on the particular manufacturer. And there's some part of that variable that is a number chosen by EPA. Maybe the denominator is a number chosen by EPA. I don't know where it is in the formula. But if EPA is choosing at least some of the numbers that go into that formula, not a formula that's all variables, but some of the numbers that go into that formula, I think that's different than just saying, well, there's a formula with nothing but X, Y, and Zs and NHTSA can take that mathematical formula and decide what should be Y, what should be Z, and we'll make X the information we get from the manufacturer. Aren't those two different things? And which one are we talking about here? That's a great question. And I think the best way to answer it is to say the regulations, as you correctly note, include values that a are plugged into the formula. And neither of those values requires EPA to do anything other than review the application that manufacturers submit. The coefficients, the values that EPA has created, as you mentioned, are static and they're already written into the regulation. So there's nothing new being created when a manufacturer is seeking confirmation of its standard. But if I heard there in the middle, it is EPA that's picking the coefficients, not NHTSA. So the coefficients are written into these compliance regulations and housed under Title 40. They support both EPA's emission standards and NHTSA's fuel economy standards. So are you saying Congress picked the coefficients or EPA picked the coefficients or something else? Well, this is a joint rulemaking between EPA and NHTSA, so I can't tell you all of the process that led to the development of those numbers. But I think it'd be fair to say that the agencies developed them together. Okay, thanks. I see I'm out of time. Thank you. And in closing, I'll just note that these are the largest, segment of the largest vehicle on our roads. They contribute substantially both to the air pollution and the fuel consumption that Congress designed these statutes to reduce, and I would urge the court to uphold both agency standards. Thank you, Ms. Henderson. Ms. Theodore, we're out of time, but as we generally do, we'll give you two minutes for rebuttal. Thank you, Your Honor. A couple quick points. So first of all, on this notion that there's some sort of gap here, the Clean Air Act has been around since 1965, and trailers haven't been regulated at all during that entire time. So it's completely plausible that Congress did not intend the regulation of trailers. On the EPA rules, I heard no response from respondents or intervenors on what the word self-propelled could possibly be doing in this statute if it wasn't intended to exclude trailers, which also means that EPA can't get around that by claiming it's regulating tractor-trailers. And the notion that a tractor without a trailer is not a vehicle, as I heard Mr. Byron say, doesn't make any sense. EPA has been regulating tractors by themselves for years, including in the Phase I standards. So let me turn to the argument that the ESA gives EPA authority to do this is just completely wrong. So Section 32904 only authorizes regulation of manufacturers. Manufacturers is defined in Section 32901.14 to mean a person engaged in manufacturing automobiles, and Section 32901.3 defines an automobile as something that's less than 10,000 gross vehicle weight, meaning not a heavy-duty vehicle. And that's because 32904 actually isn't part of the ESA. It was added in 1994 when NHTSA only had authority to regulate heavy-duty vehicles. And if you look at the government's stay opposition, they admit that this provision 32904 does not authorize the regulation of trailers, even under their theory that a trailer is a vehicle. 32904 just says a manufacturer subject to Section 32902b. And so it seems to me that's just the question is if trailers are included in the ESA definition of motor vehicle, then they are a manufacturer subject to 32902b and therefore covered by 32904. Am I wrong? I don't think so, Yara, because they're not a manufacturer. Manufacturer is defined in the statute, and it's defined to mean someone who manufactures automobiles, which is defined to exclude heavy-duty vehicles. Why would they refer to 32902b through d, which includes then both automobiles and heavy truck vehicles and things like that? It's because 32904 was enacted in 1994 before that other provision was amended, and it's just a cross-reference to be when b was different before the ESA was enacted. But in any event, I mean, the EPA doesn't rely on ESA, so it doesn't really matter because what matters is what the EPA actually claims regulatory authority under. And at JA238, they make clear that they're only relying on the Clean Air Act. So turning to the separability analysis very quickly, the question is not whether every provision of NHTSA's rules couldn't function. It's whether striking EPAs would impair the function of NHTSA's rules. It's very clear that it would, and I heard no explanation of how a manufacturer could possibly determine whether they comply if they can't get someone to tell them that their trailers comply. But also, I mean, the testing regulations, it's trailer manufacturers, they can't simply plug numbers into the equation. They have to do tests, and the regulations make very clear that EPA has to pre-approve those tests. And so in the absence of EPA acting to pre-approve those tests, you can't even figure out whether you comply with the regulations in the first place, even putting aside the absence of the Certificate of Conformity. In response to the question whether separability is the right analysis, I certainly think the United States has waived any argument that it's not. And again, the Delta case from this court, it applied the separability analysis to a joint EPA-NHTSA rule. We're talking about them being bifurcated. I don't know if that's... All it did was talk about them being bifurcated. So the Delta case is a case that said that the petitioners didn't have standing because they only challenged the EPA portion of the rule, and there's no addressability because the NHTSA portion of the rule would stand in the absence of the EPA portion of the rule. And the court said the question in deciding whether that was so was whether NHTSA's provisions were dependent on EPA's. So that's the same question that we're addressing here. Dependent is not the same thing as severable. They could very well be whether they can operate in a non-arbitrary way without given the cross-references. That's all I'm struggling with. I guess I didn't see... They talked about whether the fuel economy standards cannot be bifurcated from the greenhouse gas emission standards, but it wasn't clear to me that that was a severability analysis as opposed to... Well, Your Honor, however you want, whatever you want to call it, I think it's the same functional analysis. The question is whether the NHTSA rules can operate as law without the operation of the EPAs. And you could call it a severability analysis, you could call it an arbitrary and capricious analysis, which we certainly haven't waived since we argued that the NHTSA rules were non-functional and made no sense without the EPAs. So I think the court can whatever it wants to call it, but the question is really the same. You're looking at the rule and you're looking at what the scope of the remedy is and what you have to vacate. And you can't leave NHTSA's provisions if they make zero sense without the EPAs, which they do make zero sense. And again, that's the world we're living in right now. All right. Are there further questions from the bench? 32904C, is that limited to cars or would that also apply to covered heavy vehicles? Let me just pull up 32904C, I'm sorry. It talks about each model, so I'm not sure if that means cars or not. Yeah. So 32904C also refers to a quote unquote manufacturer. Manufacturer is defined in statute with reference exclusively to non-heavy duty vehicles. Okay. Thank you. All right. We'll take them at it. You have something more? I would just close by asking the court to act swiftly on the stay because it really is creating an enormous problem for trailer manufacturers right now that they can't take orders while assuring their customers that they can actually sell those trailers in 2020. Can I ask one very quick question on the stay thing? It seems like has the harm already been done, the irreparable harm? I mean, you all have to start preparing for January 1st as if this rule is going to be in effect, and I suspect you can't start doing that tomorrow, September 16th. Absolutely, your honor. Yes. I mean, there is irreparable harm going on right now every day, and that's why we would ask the court to act as swiftly as it can on the stay. But there's some irreparable harm that has not yet happened. Well, for example, if a trailer manufacturer could take an order tomorrow, that would be very helpful. And if the court's regulations, then a trailer manufacturer could do that and could offer a trailer for sale in 2021. When did the irreparable harm start? I'm sorry? When did the irreparable harm start? It's been ongoing. It depends on each trailer manufacturer because, you know, they sort of had given me a rough estimate. I'd say in the last month or so. I mean, trailer manufacturers are starting to take orders right now. There's like a three or four month lead time. Okay, thanks. So given the stay on EPA, what have the trailer manufacturers been doing with respect to compliance? So the trailer manufacturers have asked EPA if EPA is going to issue certificates of conformity. EPA said no. The trailer manufacturers have asked EPA if there's anyone in NHTSA they can talk to. EPA said it has no idea. So the trailer manufacturers are sort of just planning for trying to think about, you know, building warehouses to store this equipment and, you know, potentially to comply even in the absence of a certificate of conformity. But basically it's impossible. I mean, that's the thing. Have they talked to NHTSA about? You said they've talked to EPA. Have they talked to NHTSA about what to do? There's no one at NHTSA. There's no one at NHTSA who will talk to them about what to do. The trailer manufacturers have asked, and this is in the declarations, they've asked the EPA, like who at NHTSA will implement this, and EPA says they have no idea. Okay. Are there any further questions then? We'll take the matter under submission. Thank you. And the Corps will take a brief recess. Thank you.
judges: Garland, Millett, Walker